1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GUSTAVO COVIAN,

          Petitioner,

   v.

JEANNE WOODFORD, Director, California
Department of Corrections and Rehabilitation,

          Respondent.

_____/

No. C 05-04851 JSW

**ORDER DENYING AMENDED
PETITION FOR WRIT OF
HABEAS CORPUS**

**INTRODUCTION**

      This matter comes before the Court upon consideration of the amended petition for a
writ of habeas corpus filed by Gustavo Covian ("Covian"), pursuant to 28 U.S.C. § 2254, in
which Covian challenges his conviction for first degree murder. The Court has considered the
parties' papers, relevant legal authority, and the record in this case. For the reasons set forth in
the remainder of this Order, the Court HEREBY DENIES Covian's petition.

**BACKGROUND**

      Covian was convicted, following a jury trial, of first degree murder with a financial gain
special circumstance of Young Kim ("Young"). The facts, as found by the California Court of
Appeal, are lengthy and, therefore, are set forth in full in the Appendix to this Order. In sum,
on November 13, 1998, Young, who with his wife Kyung Kim ("Kyung") operated a restaurant
in Gilroy, California, disappeared after returning home from his restaurant and was never seen
again. One of his friends, Alfonso Bravo ("Bravo"), asked Kyung about Young's whereabouts
and she said that Young had taken off for Mexico. Another of Young's friends, Mauro Sanchez

("Sanchez") also asked Kyung about Young's whereabouts and she also told Sanchez that Young had gone to Mexico. Sanchez "knew that Young never just disappeared, so he went to the restaurant and then accompanied Kyung to report her husband missing." (*See* Answer, Ex. H (Court of Appeal Opinion) at 6.) Testimony at trial suggested that Covian had admitted to family members that he killed Young and rumors that he did so circulated amongst his family. One such admission provides the basis for Covian's claim in this case.

As set forth in the Court of Appeal's opinion:

> Sometime in 1999, less than a year after Young vanished, Sanchez encountered Bravo in a bar. Sanchez testified Bravo told him the Covian and Sanchez families were from the same hometown in Mexico. At a Covian family barbecue in Hollister, Bravo heard defendant brag that he had killed Young. Sanchez was "totally blown away" by this revelation and asked Bravo what he did. Bravo answered, "hey, he's my friend." Sanchez stated Bravo warned him that the defendant and his family were very dangerous.[4] Sanchez did not report the conversations to police because he feared getting involved.

> 4.    At trial, Bravo denied the conversation although he admitted knowing the family since they were children in Mexico. Bravo stated he wanted no problems with the Covians; he was concerned that his own family would be harmed if he testified against defendant. He stated he heard that defendant told Estrada, "If you say anything, Chuy, I'll kill you."

(Answer, Ex. H at 7.)

During its deliberations, the jury sent out a note, which trial counsel believed pertained to the conflict between Sanchez and Bravo's testimony. Trial counsel renewed an in limine motion relating to Sanchez' testimony and also requested that the Court reopen the case so that he could present Arturo Macias as a witness.[1] In its discussion of the issue, the Court of Appeal stated:

> Although Sanchez testified Bravo had told him about [Covian's] admission, Bravo had told a prosecution investigator that he heard about it from [Arturo] Macias. Macias was in Mexico and was not subpoenaed by the defense to testify, but while the jury was deliberating, he became available. He told a defense investigator that he had a conversation with Bravo at a gas station. [Covian] moved to reopen the case after the jury sent out a question reading, "[i]f witness [A] says, I never said X. to B,' and witness B. says, "A. told me

---

[1]    The trial court denied the motion to strike Sanchez' testimony, and the Court of Appeal found no error in the trial court's evidentiary ruling. (Answer, Ex. H at 21-25.)

X.,' it seems that we may use rule CALJIC 213[2] to determine that X. is true. Have we understood this rule correctly? How does this rule work with [CALJIC No.] 209?"[3]

(Ex. H at 25-26; *see also* Answer, Ex. D, Vol. 5, Reporters Transcript ("RT") at 1237.)

As set forth in the record, the trial court responded to this note by advising the jury as follows:

> With respect to CALJIC 213, you have interpreted that section correctly. It may be used to determine or consider whether X. is true, unless you were instructed that it was not offered for the truth of the statement. Do that satisfy the question? Do you want me to repeat it? Want me to repeat it?
>
> Under CALJIC 213 with respect to this hypothetical you have posed, you conclude: It seems that we may used 213 to determine that X. is true. And the answer is yes, you may use that rule to determine or consider whether X. is true, unless you were instructed at the time as to that statement that it was not offered for the truth of that statement.

(Answer, Ex. D, Vol. 5, RT at 1237-38.)

Trial counsel responded to the Judge's instruction as follows:

> Your Honor, I appreciate you giving that instruction and trying to clarify that for the jury. I'm very concerned that they are focused on the testimony by Bravo that he never made a statement. You heard the writing and the testimony then by Sanchez that he probably did make such a statement to me.

---

[2]     California Jury Instruction - Criminal 2.13, as given to the jury provides: "Evidence that at some other time a witness made a statement or statements that are inconsistent or consistent with his or her testimony in this trial, may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. If you disbelieve a witness's testimony that he or she no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by him or her describing that event." (Answer, Ex. D, Vol. 5, RT at 1202.)

[3]     California Jury Instruction - Criminal 2.09, as given to the jury provides: "Certain evidence was admitted for a limited purpose. At the time this evidence was admitted you were instructed that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. In this connection, you were instructed several times that testimony by a witness about what the witness heard someone say out of court could not be considered for the truth of the content of the out-of-court statement. Such statements were offered for the limited purpose of showing that the witness heard that particular version of the rumors that were circulating after November 13th, 1998. ... Do not consider any of this evidence this evidence for any purpose except the limited purpose for which it was admitted." (Answer, Ex. D, Vol. 5, RT at 1201.)

3

I made a written motion to exclude that evidence under 352, and then I elaborated on that in my argument.[4]

And as I recall, Your Honor, there was a third witness on that subject. The witness was Arturo Macias was one of the people that had been interviewed on that subject. I had put him on my witness list, but it turned out we were not able to subpoena him because he was in Mexico. He's now available, and I have spoken with him. And I'm persuaded that this rumor [that at a barbecue Covian admitted to killing Young], and it's nothing but rumor, I'm persuaded that it started with him [Macias] having a conversation with Bravo at a gas station.

Now I say all of this, because I'm going to renew the motion under Evidence Code section 352 that the whole thing be stricken. And I won't belabor the point, other than to say that my concern about this from the beginning was that it was bad enough when it was secondhand hearsay. It goes from Bravo denying that he ever made the statement to Sanchez saying he did make the statement. And the jury has to consider did Bravo make that statement. And you just told them they can consider it. But then they are now permitted to further consider it for the truth of the statement. And the problem is, I truly believe, and I think the evidence supports this inference, is that it really was nothing more than the same rumors that were being spread around. This particular rumor was that Gustavo had been at a barbecue where he made the statement.

So on this particular one, the jury – because it was not limited, it was not limited under 209, the jury has been instructed that they can consider it for the truth of the statement. But when I cross-examined Sanchez on it, one of the last things I asked him is why he didn't report it to the police when the statement was made back in about 1999. And part of his answer was because he had no idea whether it was true or whether it was just rumor being spread around by Bravo. And it may be that was more my questioning than his answers, but I think he affirmed that.

And so I just – my suggestion to the Court is that it is simply unreliable hearsay. It's triple hearsay, and it really is nothing more than rumor. And it's not the kind of reliable evidence that we should use that might convict a man of a homicide. I, by way of offer of proof, I have Arturo Macias here this morning if the Court wanted to take any further evidence on whether or not this rumor started with him.

(*Id.* at 1239.)

The trial court denied the motion to strike and denied the motion to reopen to present

Macias, reasoning that:

What it really reduces itself down to is a question of credibility and believability by the trier of fact. Do they believe Mr. Bravo? Do they believe Mr. Sanchez? If they believe Mr. Bravo, they will conclude that Mr. Sanchez either is not telling the truth or his recollection is incorrect.

---

[4] The argument on Covian's motion in limine is found in Answer, Ex. D, Vol. 1, RT at 89-101.)

If they believe Mr. Sanchez and they believe that his credibility is better than Mr. Bravo's, then they can conclude that Mr. Bravo was not a credible witness because he was inconsistent. And, also, they could consider that statement that Mr. Sanchez attributes to Mr. Bravo that the defendant said what he said for the truth of that statement, because that's admissible also as a hearsay exception.

Now, it boils down, in the Court's view, to a question of credibility for the trier of fact to decide. That's their province. I can't open the case up now for additional evidence on that issue once the jury has been deliberating for a day and a half. Again, it's just a question of credibility. The jury is going to believe Mr. Bravo or they are going to believe Mr. Sanchez. If they believe Mr. Sanchez, yes, they can consider it not only to impeach Mr. Bravo, but they can consider it for the truth of the statement that Mr. Covian allegedly made to Mr. Bravo. That's the law. And it's not that unusual for that type of situation to arise in the trial. And, again, the final arbiter of that is the trier of fact, the jury.

So, again, from a very technical legal perspective, it is admissible for impeachment. And, yes, it is admissible for the truth of the matter asserted, if the trier of fact wants to reach that conclusion based upon their evaluation of those two witnesses and their evaluation of their credibility. But I'm not going to stop the jury deliberations now to reopen the trial and have additional evidence offered and additional cross-examination. And maybe that would cause additional witnesses to be called and have a mini trial now. It's not appropriate. It's not timely. And so that request is denied.

(*Id.* at 1241-43; *see also* Answer, Ex. H at 26.)

That same day, the jury convicted Covian of first degree murder. (*Id.* at 1247-53.)

## PROCEDURAL HISTORY

Covian appealed his conviction to the California Sixth Appellate District Court of Appeal. On March 16, 2004, Covian filed a state habeas petition. The Court of Appeal affirmed his conviction and denied his habeas petition on June 2, 2004. The California Supreme Court denied review on September 1, 2004. Covian then timely filed a petition for writ of habeas corpus in this court on November 28, 2005, and simultaneously filed a request to hold this petition in abeyance, pending exhaustion of certain claims. On April 14, 2006, the Court denied the motion, and on May 8, 2006, Covian filed his amended petition for writ of habeas corpus.

//

//

//

5

**ANALYSIS**

**A.      Standard of Review.**

   This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions apply. *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

   Under AEDPA, this Court may grant the petition with respect to any claim that was adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 413 (2000) (hereinafter "*Williams*"). Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

   "Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has explained repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential standard for reviewing state-court determinations.

1    *See id.* at 436. Thus, that Court has emphasized that "[a] federal court may not overrule a state

2    court for simply holding a view different from its own, when the precedent from [the Supreme]

3    Court is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

4         Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ

5    only if the state court "applies a rule that contradicts the governing law set forth in [Supreme

6    Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a

7    decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*,

8    537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable

9    application" clause of section 2254(d)(1), a federal court may grant the writ if the state court

10   identifies the correct governing legal principle from the Supreme Court's decisions but

11   unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at

12   413.     A federal habeas court "may not issue the writ simply because that court concludes in

13   its independent judgment that the relevant state-court decision applied clearly established

14   federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

15   at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S.

16   at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968

17   (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state

18   court's application of federal law was erroneous, clearly or otherwise. While the 'objectively

19   unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

20   deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*,

21   331 F.3d at 1068.

22        In determining whether the state court's decision is contrary to, or an unreasonable

23   application of, clearly established federal law, a federal court looks to the decision of the

24   highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v.*

25   *Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily

26   denied a petitioner's claim, the habeas court may "look through" that decision to the last state

27   court addressing the claim in a reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072,

28   1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

1    In this case, the California Supreme Court summarily denied Covian's petition.

2   (Answer, Ex. K.)  The California Court of Appeal denied Covian's claim in a reasoned decision.

3   (*Id.*, Ex. H.)  Accordingly, this Court will "look through" the California Supreme Court's

4   decision to the California Court of Appeal's decision in deciding whether that court's decision

5   was contrary to, or an unreasonable application of, clearly established federal law.

6   **B.       Section 2254(d) Applies to Petitioner's Case.**

7           As a threshold matter, the Court must address Covian's argument that Section 2254(d)

8   does not apply to his claim for relief.  Covian contends that because the California Court of

9   Appeal did not discuss his constitutional claim, it did not adjudicate the claim on the merits.

10  Therefore, Covian contends, the Court should review his case de novo.

11          Section 2254(d) of AEDPA states that it applies to claims that were "adjudicated on the

12  merits in State Court proceedings . . . ."  28 U.S.C. § 2254(d).  The Ninth Circuit has held that "a

13  state has 'adjudicated' a petitioner's constitutional claim 'on the merits' for purposes of

14  § 2254(d) when it has decided the petitioner's right to post conviction relief on the basis of the

15  substance of the constitutional claim advanced, rather than denying the claim on the basis of a

16  procedural or other rule precluding state court review of the merits."  *Lambert v. Blodgett*, 393

17  F.3d 943, 969 (9th Cir. 2004); *see also Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005).

18  In *Lambert*, the Ninth Circuit also suggests that a state court need not specifically address the

19  constitutional claims to conclude that those claims were in fact adjudicated on the merits.  *See*

20  *Lambert*, 393 F.3d at 968 (citing cases).

21          The Court of Appeal analyzed whether the trial court abused its discretion by refusing

22  to open the case but did not address specifically the arguments raised in Covian's supplemental

23  brief, namely whether the trial court's actions also violated Covian's rights under the Sixth and

24  Fourteenth Amendments.  (*See* Answer, Ex. L.)  However, the issues were presented to the

25  Court of Appeal, and the Court of Appeal's opinion does not suggest that it refused to consider

26  those arguments on "the basis of a procedural or other rule precluding state court review of the

27  merits" of his claim.  Therefore, the Court concludes that Section 2254(d) of AEDPA applies to

28  Covian's case.  Even if, however, the Court of Appeal's decision could not be construed to have

1    adjudicated the claim on the merits, the Court still finds that Covian's petition should be denied.

2    **C.    The Trial Court's Refusal to Permit Covian to Re-Open His Case.**

3         **1.    Legal Standards.**

4         A criminal defendant's right to present a defense, to offer witnesses, and to compel

5    their attendance is "a fundamental element of the due process of law." *Washington v. Texas*,

6    388 U.S. 14, 19 (1967).[5]  "Whether rooted in the Due Process Clause of the Fourteenth

7    Amendment ... or in the Compulsory Process or Confrontation clause of the Sixth Amendment,

8    ... the Constitution guarantees criminal defendants 'a meaningful opportunity to present a

9    complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986).  The Compulsory

10   Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to

11   have compulsory process for obtaining a favorable witness.  This right was held applicable to

12   the states through the Fourteenth Amendment:

> The right to offer the testimony of witnesses, and to compel their attendance,
> if necessary, is in plain terms the right to present a defense, the right to
> present the defendant's version of the facts as well as the prosecution's to the
> jury so it may decide where the truth lies.  Just as an accused has the right to
> confront the prosecution's witnesses for the purpose of challenging their
> testimony, he has the right to present his own witnesses to establish a
> defense.  This right is a fundamental element of due process law.

17   *Washington*, 388 U.S. at 19.

18        In *Washington*, a witness who was relevant and material to the defense was excluded

19   from testifying because of a state statute forbidding co-defendants to testify for or against each

20   other. *Id.* at 19.  The Supreme Court held the petitioner was "denied his right to have

21   compulsory process for obtaining witnesses in his favor because the State *arbitrarily* denied

22   him the right to put [his witness] on the stand" *Id.* at 23 (emphasis added).

23        In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court held that the

24   defendant was denied a fair trial when the state's evidentiary rules prevented him from calling

25   other witnesses who would have testified that the first witness made inculpatory statements on

26   the night of the crime. *Chambers*, 401 U.S. at 294, 302.

27   _____

28        [5]    The trial court's ruling did not preclude Covian from presenting his chosen
     theory of defense.  Rather, Covian contends the ruling precluded him from presenting a
     *complete* theory of his defense.

In *Crane*, the Supreme Court considered state rules that precluded a defendant from presenting evidence on whether his or her confession was voluntary, once a trial court made a pretrial determination on that issue. The Court held that the procedure violated the defendant's right to have a fair opportunity to present a defense, whether rooted in the Fourteenth Amendment's Due Process Clause or in the Sixth Amendment's confrontation or compulsory process clauses, because it mechanistically excluded competent, reliable evidence bearing on the credibility of a confession when that evidence may be central to the defendant's claim of innocence. *Crane*, 476 U.S. at 690-91.

Similarly, in *Rock v. Arkansas*, 483 U.S. 44 (1987), the Supreme Court concluded that the application of Arkansas' *per se* rule excluding all hypnotically enhanced testimony violated the defendant's rights under the Compulsory Process Clause and the Due Process Clause of the Fourteenth Amendment because it restricted the defendant's ability to testify on her behalf. *Id.* at 56-62; *see also Green v. Georgia*, 442 U.S. 95 (1979) (finding that the defendant's due process rights were violated where Georgia evidence code did not recognize an exception to hearsay evidence that was highly relevant and reliable).

However, the right to present a defense is not unlimited. The right to confront one's accuser "is not absolute, and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Chambers*, 410 U.S. at 295; *see also Rock*, 483 U.S. at 55. The defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* at 302.

> The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case. The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony. Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence. The State's interest in the orderly conduct of a criminal trial is sufficient to justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.

*Taylor v. Illinois*, 484 U.S. 410-11 (1988); *see also Perry v. Rushen*, 713 F.3d 1447 (9th Cir. 1994).

**2.    Discussion.**

Covian contends that the trial court violated his constitutional rights to present a defense and to due process when it refused to reopen the case to allow him to call Macias as a witness, after the jury had been deliberating for a day and a half.[6]   The lesson to be drawn from *Washington*, and its progeny, is that "states may not impede a defendant's right to put on a defense by imposing mechanistic (*Chambers*) or arbitrary (*Washington* and *Rock*) rules of evidence."   *LaGrand v. Stewart*, 133 F.3d 1253, 1266 (9th Cir.), *cert. denied*, 522 U.S. 971 (1998).   That is not what occurred in Covian's case.   The trial court did not preclude Macias from testifying because of an arbitrary or mechanistic rule of evidence.   Rather, the trial court was confronted squarely with a situation where it had to balance Covian's request to present additional evidence against the fact that the parties had completed their evidentiary presentations and the jury had retired to deliberate.

When confronted with such a request, under California law, a court may consider "the stage the proceedings have reached when the motion is made; the diligence shown by the moving party in discovering the new evidence; the prospect that the jury would accord the evidence undue emphasis; and the significance of the evidence."   *People v. Frohner*, 65 Cal. App. 3d 94, 110 (1976).   This Court cannot say that those considerations are in any way arbitrary or mechanistic.   Rather, the factors represent guidelines to follow when a court decides whether to permit a party to reopen its case, which under state or Federal law is a matter within the trial court's discretion.   *Frohner*, 65 Cal. App. 3d at 110 (quoting *People v. Kohn,* 258 Cal. App. 2d 368, 377 (1968)); *United States v. Simtob*, 901 F.2d 799, 804 (9th Cir. 1990); *see Lawrence v. Lockyer*, 2007 WL 602302 at * 11(N.D. Cal. Feb. 22, 2007) (concluding that "state rule regarding the reopening of evidence is not an irrational rule and provided meaningful and

---

[6]       In addition to *Chambers* and *Washington*, Covian relies on *DePetris v. Kuykendall*, 239 F.3d 1057 (9th Cir. 2000), *Franklin v. Henry*, 122 F.3d 1270 (9th Cir. 1997), *Lyons v. Johnson*, 99 F.3d 499 (2d Cir. 1996), *Justice v. Hoke*, 90 F.3d 43 (2d Cir. 1996), *Dey v. Scully*, 952 F. Supp. 957 (E.D.N.Y. 1997), and *Franklin v. Duncan*, 884 F. Supp. 1435 (N.D. Cal. 1995), in support of his argument that the "exclusion of critical evidence which fully corroborates a defense presented to the jury is unconstitutional."  (Pet. at 17:22-23.)  In each of these cases, however, the trial court excluded evidence before the jury began its deliberations.  The Court, therefore, finds them to be inapposite to the issue presented in this case.

1    reasonable standards to guide that discretion"). The trial court acknowledged these factors when

2    it stated that the proffer of Macias' testimony was untimely and inappropriate. (Answer, Ex. D,

3    Vol. 5, RT at 1240-43.)

4        Although Covian included Macias on his witness list and mentioned Macias during the

5    motion in limine regarding Sanchez's testimony, during that argument Covian did not suggest

6    that Macias' testimony was important to his case nor did he reserve the right to call him if and

7    when he became available. There is nothing in the record to suggest that Covian sought to

8    continue the trial to attempt to get Macias back from Mexico. It also unclear exactly when

9    Macias became available to testify, and whether he was available before the jury retired to

10    deliberate. Further, the jury had been deliberating for a day and a half at the time Covian sought

11    to introduce Macias' testimony, and the Court of Appeal's determination that counsel's proffer

12    regarding Macias' proposed testimony was insufficient is not unreasonable.

13        Macias may well have supported Bravo's testimony, thereby undermining Sanchez'

14    testimony. However, although Macias was not permitted to testify (and it is unclear as to what

15    exactly he would have testified), there was other testimony to support Covian's theory that his

16    family was spreading rumors that he had killed Young, including the fact that numerous

17    witnesses had learned of the alleged confessions from others. Indeed, at least one of the

18    witnesses, Danny Callahan, did not necessarily believe what he had heard at first because

19    "[Ignacio Covian] just talks." (*See* Answer, Ex. D, Vol. 3 (R.T. at 792).) Similarly, Sanchez

20    was not the only witness to testify that Covian confessed to Young's murder. (*See* Ex. H at 8-9.)

21

22        The Court concludes that the denial of the request to reopen the case to call Macias as a

23    witness was neither contrary to nor an unreasonable application of clearly established federal

24    law. Covian is not entitled to the writ on this claim.

25    //

26    //

27    //

28    //

//

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. A separate judgment shall issue, and the Clerk of the Court shall close the file.

**IT IS SO ORDERED.**



Dated: January 8, 2008

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX[7]**

Defendant's trial took 15 days during which 25 witnesses testified.  Because the sufficiency of the evidence is not challenged, we shall not state the facts in detail.  Young Kim (Young) [footnote 1 omitted], who with his wife Kyung Kim (Kyung) operated the Gavilan restaurant in Gilroy, drove his car home and into his garage after he closed the restaurant around 9:30 or 10:00 p.m. on November 13, 1998.  He was never seen again.  Around the end of November, his friend Alfonso Bravo, who had met Young six years earlier by doing plumbing jobs for him, missed seeing him at the restaurant and asked Kyung where he was.  She said that Young "took off for Mexico."  Bravo asked, "'he told you he was going to Mexico?' she said, 'no, ... he just took off.'"  Young had not said he was going; Kyung "just believe[d] it."  Bravo did not think Young would "disappear like that" because when he went to Mexico on a vacation or trips he always told somebody in advance.

Gavilan waitress Sandra Herman knew a few days before Young's disappearance that he planned to go to Mexico, but she did not know for how long.  His trips were usually just for a few days.  He had never "disappeared" before November 13.  After he was gone four or five days, Kyung told Herman she hadn't heard from him.  Kyung seemed worried.  Herman suggested calling Young's family[2] but Kyung did not say anything more about Young's disappearance until her neighbor, Young's best friend Mauro Sanchez, approached her about contacting the police.  Sanchez, Kyung, and her college student daughter Helen, went to the Gilroy police on November 29, 1998.

All three were visibly upset and Kyung was crying but gave the officer "very little information.  She had told me [the officer] that he had been depressed, and ... that he did have a gambling problem."  She said she had last seen Young at the restaurant around 10:00 p.m.

---

[7]    Covian is referred to as "Defendant" throughout the Court of Appeal's decision, and the Court of Appeal also referred to the Youngs by their first names out of convenience, rather than disrespect.  (*See* Ex. H at 2 n.1.)

[2]    Chung Weber, Young's younger sister in San Diego, repeatedly called Kyung asking "if she has heard anything.  And [Kyung] got really agitated and she told me not to call her anymore about that, because she's getting headache [*sic*] from that people keep asking her what happened with my brother."  Kyung told her to stop calling.  Kyung shocked Chung because she did not seem worried and she was not looking for Young.

However, she seemed reluctant to give additional information such as "the missing person's mental state, if there had been any marital problems, anything that may help our investigators... ."  According to the officer, "that is different than [*sic*] the numerous other missing person reports that I take."

Young had been depressed about his marriage, his father, his business, and his finances, and although his sister Chung Weber thought he "wasn't really talking seriously," he had told her he wanted to kill himself.  His elderly father was dying of cancer and it fell to Young to buy a casket for him.  Young was upset because Kyung was going out exercising every night with a "guy"[3] and she would not compromise about it or try to work out problems in the marriage.  Young thought he had $400,000 in the safe at the restaurant but learned from his sister Li that Kyung had been giving money to her brothers.  Li told him and Chung that there was less than $10,000 in the safe.  Kyung handled the restaurant's finances and worked out in front.  She also handled the finances at home.  She paid Helen's college bills and gave Young spending money when he wanted it.  He did not use credit cards.  Young operated the kitchen and ordered the food.

The restaurant, a largely cash business, was doing poorly.  Two motels were being built nearby and the parking lot was so muddy that people did not want to drive or walk in.  Young socialized with the male staff but the female staff did not like him.  Herman said Young was usually unpleasant and in a bad mood and yelled and screamed a lot.  Young was "a drinker."  Two or three times Herman came into the restaurant in the morning and saw Young passed out in one of the booths "stinking like alcohol."  She also saw him drinking at work.  He wrecked two cars in one month.

Young would come home drunk and he and Kyung would shout and yell at each other.  Young pushed and hit Kyung on more than one occasion, leaving her with bruises and a black eye.  Young was physically abusive to Helen and his 12- to 13-year-old son Daniel and they were scared of him although both felt close to him.  Young gave Helen a black eye

---

[3]     Herman testified Kyung and the man dated for a couple of years and that she had warned Kyung that he was a married man who frequented the restaurant and had dated a waitress before.

one time.  Another time he kicked Daniel so hard in the leg that the boy reported it at school.  Herman said Young had to go to anger management classes because of that.  Notwithstanding, Young's sister Chung Weber described him as a fun-loving friend and a loving, caring, father and son.

Kyung confided in Herman about her problems with Young.  More than once, she told Herman that she hated her husband and wished he was dead.  Herman suggested a divorce (the marriage had been arranged) but Kyung said it was unacceptable because it would shame her family in Korea.  Kyung knew that Young had a girlfriend.

On the positive side, Young was making plans to remodel the restaurant and expected business to improve when the motel construction was finished.  Young spent time with Daniel and took him to see his grandfather and grandmother almost every weekend.

Young's friend Bravo thought he was a "very friendly person," but a lonely one, which Bravo attributed to Young's face being marked by the chicken pox he contracted when he was a child.  Young "used to ... hang around with Mexican guys all the time," and Bravo thought Young felt more comfortable around Mexican people.  Young's nickname was "Chumuboco," Mexican slang for "devil."  Young's "drinking buddies" were Bravo, Sanchez, and Jose "Chuy" Estrada, a cook at the restaurant.  Sanchez and Young went to local bars together to play pool and saw each other almost every day.  Bravo would accompany Young to Korean and Mexican bars where he sometimes met other women, including his girlfriend.  Bravo also went with him to his parents' house on the coast on two occasions and met Young's girlfriend.

Shortly after the second car crash, Kyung was angry with Young and was in the restaurant kitchen with Herman and Maria Covian (Maria), defendant's wife and a waitress at the restaurant.  They were discussing whether Young was doing drugs.  Kyung said she wished her husband had died in the car accident.  Maria answered, "There are people that could take care of that for you."  Or, people "will do stuff like that," meaning, Herman testified, "get rid of" Young.  This shocked Herman who walked away.  After that, she kept away from the other two women when they spoke privately together.

18

On Friday, November 13, 1998, Estrada and Young closed the restaurant about 9:30 or 10:00 that night after which they were going to have a beer with Sanchez. Estrada followed Young home and waited in his car while Young drove into his garage. The garage and outside lights lit up as Young drove inside, while the rest of the house stayed dark. Estrada waited for about 20 or 30 minutes for Young who did not reappear. Estrada then left. He did not see or hear anything unusual.

Daniel was downstairs watching TV in the living room. He thought his mother was upstairs getting ready for bed. Around 10:00 p.m., he heard the garage door open and, fearing his father would be angry because he had stayed up late, he ran upstairs to his sister Helen's unoccupied bedroom. However, he did not hear the garage door close or the door into the house open, or his father come inside. Daniel thought this was odd. Upstairs, his mother came into Helen's bedroom and told Daniel to go to sleep. She paced back and forth for a while and "crack[ed] open the blind and look[ed] outside" through the window that faced the street. Daniel heard nothing unusual that night. When he awoke, his father's car was in the garage but Young was not in the house. Later, when the family moved out of the house, Daniel saw defendant helping Kyung move.

A couple of weeks after Young's disappearance, Estrada went to Sanchez's house to ask about Young. Sanchez telephoned Kyung who said that Young had gone to Mexico. Sanchez knew that Young never just disappeared, so he went to the restaurant and then accompanied Kyung to report her husband missing.

Police found Young's car in the garage and its keys inside the house. None of his bags or any of his clothes were missing. His gas credit card showed no activity. Paperwork on getting a divorce was in the car's glove compartment. Young's photograph was sent to the media and to a national databank. No unidentified bodies matched his description. Mexican authorities were contacted. After Chung reported that Young had thought about suicide, the hills near his house were searched with horses and airplanes. After anonymous telephone calls in July 1999 led police to search for a body with mounted patrol and cadaver-sniffing dogs along the Las Viboras Road in Hollister, a flyover also was conducted. All results were negative.

With Young gone, defendant would come to the restaurant looking for Kyung and would leave if she was not there. He would also eat food without paying for it. Estrada overheard defendant claim that he was the owner and a boss. He said "Your boss isn't here anymore; you can do whatever you want; I can come in here and I don't have to pay." One time, defendant came into the restaurant with some children and displayed a gun that was inside his waistband to Estrada. Estrada felt defendant was trying to scare him and the other workers. Another time Herman saw defendant enter the restaurant through the back door and talk to Kyung in her office. Kyung screamed for Herman who ran to the back. Defendant was leaving through the back door. Kyung yelled to call the police. She also told Herman that if defendant called to say that she was not there.

There was a change in Maria's behavior, also. Herman saw her steal anywhere from $40 to $100 from the cash register. When Herman told Kyung about the theft, she said she would take care of it, but Maria continued to work there until she was arrested. On November 22, 1998, Maria deposited $6,600 in her and defendant's bank account. Around this time, defendant purchased a new Dodge pickup truck for himself. Six months later, Maria bought a used Toyota Camry for herself.

After Young disappeared, business got worse. A lot of the old customers, especially highway patrol officers and deputy sheriffs, were not coming in anymore. Costs kept going up. Checks Kyung sent to Helen for rent and tuition began "bounc[ing]." The gas and electricity was shut off once and Kyung had problems paying bills and meeting payroll. As of October 1999, the Internal Revenue Service put tax liens on the restaurant. Kyung's friends Hyung Il Kim and his wife, loaned her $10,000 in July and $10,000 in November 1998. Lee Yong Duk and his wife lent Kyung another $30,000 on March 1, 1999. Kyung finally declared bankruptcy and sold her house in foreclosure in 1999. Helen took over management of the restaurant when Kyung was arrested in June 2001 and sold it in 2002.

Sometime in 1999, less than a year after Young vanished, Sanchez encountered Bravo in a bar. Sanchez testified Bravo told him the Covian and Sanchez families were from the same hometown in Mexico. At a Covian family barbecue in Hollister, Bravo heard defendant brag

that he had killed Young. Sanchez was "totally blown away" by this revelation and asked Bravo

what he did. Bravo answered, "hey, he's my friend." Sanchez stated Bravo warned him that the

defendant and his family were very dangerous.[4] Sanchez did not report the conversations to

police because he feared getting involved.

Around March 2000, Kyung, crying hysterically, told Herman that she had just spoken

to defendant and that he had demanded more money from her and threatened to kill her daughter

at college in San Diego if he did not get it. On another occasion, Kyung called Herman from the

police station and asked her to come in. The police were taping Kyung's statement and she was

reluctant to talk to them. Herman advised her to tell them everything that she had told Herman,

which Kyung did. About a month after that, defendant took one of his daughters to Herman's

house, held up a small cassette tape, and said "Tell Mrs. Kim I have this." Herman stated, "I told

him that I had never had any problems with him or his family, nor did I want to be involved in

this in any way. He was very nice to me and accepted that, and he took his little girl and they

left."

At the trial, Adrian Vizcaino, defendant's brother-in-law and partner with defendant's

brother Ignacio in a San Benito County armed robbery, burglary, false imprisonment, and

endangering a child which defendant had suggested and helped plan, testified under a promise of

leniency. Vizcaino was promised that if he testified truthfully, the San Benito County court

would consider probation and an 11-year suspended prison sentence instead of the 21 years in

prison he was facing.

Vizcaino stated that before he married defendant's sister Griselda in October 1998, he

rented a room in defendant's and Maria's house in Hollister. Defendant was not working and

seemed poor, as he asked for a loan to pay bills. Defendant and Vizcaino used cocaine together,

and socialized together.

---

[4] At trial, Bravo denied the conversation although he admitted knowing the family since they were children in Mexico. Bravo stated he wanted no problems with the Covians; he was concerned that his own family would be harmed if he testified against defendant. He stated he heard that defendant told Estrada, "If you say anything, Chuy, I'll kill you."

According to Vizcaino, defendant's many brothers and sisters discussed Young's disappearance. Maria was said to have paid someone to kill Young for Kyung because he would come home drunk and beat her up a lot. Maria had also complained that defendant took his young daughters to the restaurant to collect money while he was drunk and armed with a weapon.

Vizcaino testified that when he asked defendant if he killed Young for money, defendant denied it at first but later admitted shooting Young in the head at Young's home with a .357-caliber gun. Vizcaino stated the gun resembled one police seized from defendant's house when they served a search warrant. Vizcaino had refused to borrow it for the San Benito County crimes because defendant told him he used it to shoot Young. Defendant said when the bullet hit Young's head, there was blood on the wall and the floor. Defendant did not name the others who were there, but Vizcaino eventually learned they were defendant's brothers Humberto and Ignacio. According to defendant, they cleaned up the blood and buried the body. Defendant said he "knew how to get the job done," because he was a "professional." Defendant said the price for the killing was $100,000, of which $35,000 was still owed. Defendant warned that if he was not paid the remainder, he was going to kill Kyung, too.

In June or July of 1999, Ignacio showed Vizcaino where the body was. In October, Humberto showed Vizcaino the same spot. Humberto later said the body had been moved and hidden somewhere else. Humberto and Griselda each told Vizcaino that Maria went to the burial site to perform a form of witchcraft, releasing some snakes there "so that nothing would ever be known." Humberto was blackmailing Kyung and she had given him two $1,500 payments. He wanted Vizcaino to go with him when he received the money because he "was fearful that they would do something to him; and he was also afraid of his brother Gustavo."

Around March 1999, Danny Ray Callahan, father of Tammy, the mother of Ignacio's two children, and ex-brother-in-law of Sandra Herman with whom Tammy had worked at the Gavilan restaurant, received a telephone call from Ignacio. Ignacio wanted help robbing a dairy farm in Hollister near the old Covian house by Las Viboras Creek. Callahan, who had served prison terms both in California and Washington state, agreed. Once back in California from

Washington, Callahan met with Ignacio, defendant, and Vizcaino to plan the robbery. As they discussed the robbery, Ignacio asked Callahan if he would also be willing to move a body from Hollister to somewhere near the California-Oregon border. Ignacio said the body was wrapped in plastic and buried near the creek where his parents used to live. The four men got shovels and walked toward the creek bed. They were scared away, however, by the presence of a woman and her children on the porch of a house across the creek. The idea of digging up the body was later abandoned.

The dairy appeared too difficult to rob, so Ignacio, and Vizcaino broke into a house but left without robbing anyone. Callahan drove the getaway car. Callahan was arrested for a parole violation on his way back to Vancouver, Washington. Callahan later took Detective James Callahan (no relation) to within two or three hundred yards of the spot by the creek Vizcaino had also showed the detective.

At the end of October 1999, Vizcaino fled to Wisconsin where he was arrested. He thought he had an agreement that defendant would give him money for a lawyer, but defendant failed to help. Vizcaino showed the Gilroy police the location where the body might be buried. No traces of blood or bullet holes were ever found in Young's house, car, or restaurant.

Defendant and Maria were arrested early in the morning of April 28, 2000, when police executed a search warrant. Defendant, Maria, Ignacio, and Kyung were indicted for the murder of Young Kim for financial gain. Defendant's case was severed from the others and a jury found him guilty and the special circumstance true. He was sentenced to life imprisonment without the possibility of parole. This appeal ensued.

(Ex. H at 2-10.)

23